FOUNTAIN VALLEY COMMUNITY HOSPITAL, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fountain Valley Community Hospital, Inc. v. Commissioner
Docket No. 18599-80
United States Tax Court
T.C. Memo 1987-187; 1987 Tax Ct. Memo LEXIS 185; 53 T.C.M. (CCH) 561; T.C.M. (RIA) 87187; April 9, 1987. Robert B. Martin, Jr., for the petitioner. Gregory A. Roth, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Tax Year Ended
Deficiency
10/31/73
$493,756
10/31/74
157,713
10/31/75
811,955
10/31/76
348,726
After concessions, the issues remaining for decision are: (1) what was the fair rental value of the acute care hospital leased by petitioner from a related partnership during the taxable years in dispute; and (2) what was the fair rental value of equipment leased by petitioner from the same partnership during the same years? *186 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and exhibits associated therewith are incorporated herein by reference. Petitioner, Fountain Valley Community Hospital, is a California corporation, which had its principal place of business in Fountain Valley, Orange County, California, during the taxable years 1973 through 1976 and at the time it filed its petition. It was organized in September 1969 for the primary purpose of operating for profit an acute care general hospital. From its incorporation to the date of trial all of petitioner's outstanding stock was owned by Fountain Valley Medical Development Company, a California limited partnership (Development Company or the partnership). The partnership was formed a few months before petitioner's incorporation, for the stated purpose of acquiring real property, constructing thereon a hospital building and related facilities, and leasing the same. At its formation the partnership was composed of 28 general partners, all of whom were physicians practicing in Fountain Valley, and one limited partner who was not a physician. In 1969 the partnership acquired title to unimproved land *187 in Fountain Valley and engaged the services of an architectural firm, Rochlin & Baran, A.I.A. and Associates, to design a hospital and to prepare preliminary plans for its construction on such land. Rochlin and Baran proceeded to do so by adopting the design and plans for a prototype (the "Rochlin and Baran prototype") which it had previously developed for a single-story general hospital suited for an outlying, fast-growing, and semi-urban area like Fountain Valley. At that time, the Rochlin and Baran Prototype had already been used in Orange County and other outlying areas. In late 1970 or early 1971, the partnership began to construct the hospital. At the same time, petitioner, as lessee, and the partnership, as lessor, entered into a lease with respect to the hospital property which called for a term of 20 years, commencing on the day the hospital opened for business. Under the lease petitioner was required to pay the costs of all taxes, insurance, utilities, repairs and maintenance during the term of the lease. The annual rental was $300,000 or $2,655 per bed, payable in monthly installments of $25,000. The original hospital structure, containing space for 113 beds, was *188 completed by the partnership on November 1, 1971, at a cost of $1,323,254. The hospital opened the same day, and the California Department of Public Health issued to the partnership a health facility license authorizing it to operate an acute care general hospital. The partnership was issued similar licenses for the years 1972, 1973, 1974, 1975, and 1976. In February 1972, three months after the hospital opened, petitioner and the partnership amended the lease. The amendment provided that as of February 1, 1972, the yearly rental amount would be $300,000 plus 3 percent of petitioner's annual gross revenues from the operation of the hospital in excess of $1,483,000. In the meantime, the partnership was anxious to proceed with the plan to construct a 101-bed addition to the hospital, which was step two in the Rochlin and Baran prototype. Under the original lease petitioner had agreed to obtain financing for the addition, but after consultation with its accounting firm, Arthur Andersen & Company, it was concluded that petitioner was not financially capable of providing the financing. At that point the partnership agreed to finance the construction provided the lease was again amended *189 so as to provide sufficient additional rents to liquidate the cost of the construction. Consequently, on December 18, 1972, the lease was amended a second time so as to obligate the partnership to construct the 101 bed addition to the hospital of approximately 40,000 square feet. In return, petitioner agreed to pay, beginning June 1, 1973, an annual rental equal to the greater of $720,000 or 13 percent of its annual gross billings [1]. The 13 percent was used because petitioner was advised by Arthur Andersen and Company that at that time an appropriate percentage in a hospital lease was between 11 and 15 percent of gross billings. The 101-bed addition was completed by the partnership on April 26, 1974, at a cost of $906,833. The lease was amended for a third time on February 15, 1976. In the third amendment, the partnership agreed to construct another addition to the hospital of about 1,980 square feet in order to permit an expansion of the hospital's radiology department and emergency room. In return, petitioner agreed to increase *190 the annual rent, beginning May 1, 1976, to the greater of $912,000 ($4,262 per bed) or 13 percent of petitioner's annual gross billings. This addition to the hospital was completed by the partnership on April 26, 1976 at a cost of approximately $90,000. In addition to leasing the hospital from the partnership, petitioner also leased from the partnership certain hospital equipment during the years 1971 to 1976, under six different personal property leases. The table below sets forth the rental deductions claimed by petitioner for the hospital and the personal property, as well as the amounts of petitioner's gross revenues or billings that were used to determine the amounts of hospital rent during the taxable years 1973 through 1976. Deductions Claimed
Hospital
Personal Property
Gross Revenues
Tax Year Ended
Rent
Rent
or Billings
10/31/73
$ 625,475
$ 218,142  $ 6,539,949 10/31/74
663,516
279,090
9,287,859
10/31/75
2,441,106
412,212
14,368,686
10/31/76
1,620,133
683,889
15,887,866
TOTAL
$5,350,230
$1,593,333   $46,084,360 In the notice of deficiency, respondent determined that the amounts claimed by petitioner exceeded *191 reasonable amounts for rent within the meaning of section 162(a)(3). OPINION A. Hospital Rent
Respondent admits that the $300,000 annual rental called for in the original lease for the hospital was reasonable, but contends that the rental amounts provided for in the amendments to the lease were not reasonable. Furthermore, with respect to the first amendment, respondent contends that it should not be recognized for tax purposes because no consideration was given to petitioner in return for agreeing to pay a higher rent. 1. Rentals under first amendment to lease
Any excess rents paid by petitioner under the first amendment to the lease are not deductible. See Stanwicks, Inc. v. Commissioner,15 T.C. 556 (1950), affd. per curiam 190 F. 2d 84 (4th Cir. 1951); Consolidated Apparel Co. v. Commissioner,17 T.C. 1570 (1952), revd. in part 207 F. 2d 580 (7th Cir. 1953); and Ray's Clothes, Inc. v. Commissioner,22 T.C. 1332, 1340 (1954), where we held that if a corporation holding a leasehold interest under a lease with a related party accepts, without consideration, a new and less advantageous *192 lease, the corporation is not entitled to deduct as rent the excess of the payments required under the new lease over the payments required under the old lease, because the excess amounts are not required as a condition to the continued use of the property. [2]
In the case before us, petitioner and the partnership are clearly related parties. It is also clear that petitioner accepted without consideration an amendment to its lease, because the original required a fixed rent of $300,000 per year while the amendment required a minimum rent of $300,000, plus the amount by which 3 percent of petitioner's gross revenues exceeded $1,483,000. Consequently, under the decisions cited above petitioner is not entitled to deduct any rental payments in excess of $300,000 made under the first amendment to the lease. 2. Rentals under second and *193 third amendments to leases
In contrast to the first amendment to the lease, petitioner received consideration for agreeing to the second and third amendments which required higher rentals since in both of these instances the partnership obligated itself to construct additions to the hospital. Thus, the issue with respect to the rentals paid under the second and third amendments is limited to whether or not such rentals were reasonable in amount. Respondent first contends that petitioner could have constructed the additions under the original lease but failed to do so and that this fact affects the reasonableness of the rentals. On this record we are not convinced that petitioner had the financial capability to build the additions and have found otherwise. Furthermore we are not satisfied that this argument has any relevance. Secondly respondent contends that the rents paid for the hospital under the second and third amendments are not reasonable in amount. On this point each party produced an expert witness as to the fair rental value of the hospital. Michael Camras, petitioner's witness is an appraiser from the Los Angeles area and is familiar with hospital properties *194 in Orange County. He used two methods to arrive at a fair rental value for the hospital. Under the first method, Mr. Camras compared petitioner's lease to the leases on thirteen hospitals in the Orange County area which he considered comparable. Most of these leases contained both a minimum and a percentage rental. The percentages ranged from 10 percent to 15 percent of gross revenues, with the earlier leases being at the lower end of the spectrum and the later leases at the higher end. Under the 13 leases used by Mr. Camras, the minimum annual rent per bed ranged from $2,613 to $6,769, with the average being $4,522. The average rent per bed under the 13 leases of $4,522 was more than the minimum rent of $2,655 per bed paid by the petitioner under the original lease entered into in late 1970 or early 1971, the minimum rent of $3,364 per bed under the second amendment entered into in 1972, or even the minimum rent of $4,262 per bed under the third amendment entered into in 1976. From all of the above, Mr. Camras concluded that the minimum rentals agreed to by petitioner were fair and reasonable. He also concluded that the percentage rental of 13 percent of gross receipts was *195 fair and reasonable because it was comparable to the percentage rentals in leases examined by him. The second method used by Mr. Camras was based on sales of hospitals which he considered comparable to petitioner's. After determining a fair market value for petitioner's hospital from comparable sales he multiplied this value by a rate of return that an unrelated lessor of comparable property would require. It was necessary to go through these steps for each year at issue. [3]
From 40 hospital sales which occurred in California between 1968 and 1981, Mr. Camras selected 13 sales involving hospitals which he considered were the most comparable to the hospital at issue. All of the sales selected by him took place in the late 1960's and early 1970's. The sales prices included the hospital structure as well as all the equipment and supplies associated therewith. The sales examined by Mr. Camras yielded prices per bed ranging *196 from $51,600 to $93,700, with the average being $69,000. He chose the average price per bed of $69,000 to use as a beginning point for the hospital in this case because although petitioner's hospital had a limited operating history in 1971 to 1973, its structure was newer and physically superior to most of the 13 he examined. Camras used this average for 1971 to 1973, but for later years he adjusted the average to reflect cost-of-living increases. Thus, Camras used as the fair market value per bed of petitioner's hospital $69,000 for 1971 to 1973, $75,900 for 1974, $83,500 for 1975, and $91,800 for 1976. He then multiplied these values per bed times the number of beds available for each year, to arrive at the hospital's fair market value for that year. [4] Finally, Camras multiplied the values determined in the above manner by 11 percent in 1971, 1972, and 1973, 12 percent in 1974, and 13 percent in 1975 and 1976 in order to compute a fair return (rent) on the value of the property. His calculations are summarized below: Taxable
Fair Market
Rate of
Fair
Year Ended
Value (rounded)
Return
Rental
10/31/73
$7,800,000
11%
$858,000
10/31/74
7,800,000
11 [5]
429,000
(six months before addition)
16,200,000
12
972,000
(six months after addition)
10/31/75
17,800,000
13
2,314,000
10/31/76
19,600,000
13
2,548,000
*197 Since both the actual rentals paid and the minimum rentals agreed to by petitioner for both the hospital and its equipment were less than the fair rentals computed above, Mr. Camras again concluded that the rental amounts agreed to by petitioner were fair and reasonable. Respondent's expert witness was Robert Lea, an appraiser from Los Angeles. He also determined fair rentals for petitioner's hospital during the years in dispute by using the comparable sales method. However, he did not use the comparable lease method because in his opinion there were not enough leases between unrelated parties, i.e., parties having no common ownership, to provide helpful comparisons. In his report Lea set forth only four sales of hospitals which he considered comparable to petitioner's hospital. None of those selected by him *198 were located in Orange County or appeared on Camras's list of comparable sales. Lea rejected all sales involving related parties and any sale in which the consideration included stock in a publicly traded company. At trial Lea withdrew one of his comparable sales because the seller received some stock, which in Lea's opinion rendered that sale incomparable. Lea also admitted that he did not have available to him the data on certain sales cited as comparables by Camras. Based on the four comparable sales cited in his report, Lea determined fair rental values for the years at issue as follows: Taxable
Price Per
No. of
Fair Market
Rate of
Fair
Year Ended
Bed
Beds
Value
Return
Rental
10/31/73
$30,000
113
$3,390,000
12.5%
$425,000
10/31/74
30,000
164(avg.)
4,920,000
12.5 615,000
10/31/75
32,000
214
6,850,000
12.75
875,000
10/31/76
35,000
214
7,490,000
12.75
955,000
On brief, respondent inexplicably not only rejected the conclusions reached and method used by petitioner's expert, he also rejected those of his own expert and introduced an entirely new method for determining the fair rental values. He argued that the *199 annual fair rental value of petitioner's hospital at any given date was the original rental of $300,000, plus a reasonable annual investment return on the construction costs of any additions completed after that date. Thus, a fair rental value as of the date the 101 bed addition was completed was $300,000 plus a 12.55 percent return on the total of the construction costs of the addition. Respondent also presented an alternative argument based upon assumed replacement costs of petitioner's hospital. We are unable to adopt either of respondent's approaches for two reasons. First, we agree with Mr. Camras that the replacement cost of a hospital is not a reasonable method of determining its fair market value because it fails to take into consideration the intangibles mentioned by him. Secondly, the experts who testified obviously were much more qualified than respondent's counsel to determine the proper method of appraisal. Furthermore they in fact both adopted the comparable sales approach although Mr. Camras also arrived at the same conclusion by using comparable leases. We have carefully reviewed and considered the reports and the testimony of both experts. However, we found *200 Mr. Camras to be more knowledgeable about the hospital industry in Orange County. In addition, we were impressed with the quality and thoroughness of his report, which we believe was substantially accurate despite a few minor errors concerning the rentals and sales prices of other hospitals. In contrast, we think that Mr. Lea was too narrow in his scope of inquiry and should not have limited his comparables to sales that involved only cash and that were between parties having not even a remote relationship. Because of these restrictions, Mr. Lea's conclusion was ultimately based on only three sales, none of which was convincingly shown to be comparable. For all of the above reasons, we are satisfied that Mr. Camras's conclusion that the rentals paid by petitioner were fair and reasonable is correct with respect to all rentals paid under the second and third amendments to the lease. Equipment Rent
In his notice of deficiency, respondent disallowed a portion of the rentals paid by petitioner to the partnership for equipment on the grounds that such rentals were excessive. On brief, respondent has raised for the first time other grounds for disallowing the deductions. [6] *201 We will only address respondent's original argument since the arguments asserted on brief are untimely and furthermore are not supported by the evidence. Mr. Camras, petitioner's expert witness, did not separately cover the fair rental value of the equipment. However, the fair rental value of the equipment and the equipment rentals were included in his computations of a fair rental for a hospital using the comparable sales method. In other words, as he points out in his report, all of the sales of hospitals which he considered comparable to petitioner's hospital included their equipment. Consequently in making his comparisons he determined and used a fair rental for the comparables which included equipment and compared that with the total rentals paid by petitioner for the hospital and the equipment. His ultimate conclusion was that the total rents paid by petitioner for both the hospital and its equipment were fair and reasonable when considered with his comparables. We agreed with respect to rents paid *202 for the hospital under the second and third amendments to the lease. With respect to the equipment alone, the record contains only the report and testimony of William Sahlan, a valuation engineer for respondent. He computed a fair rental for the equipment in each year by multiplying what he considered to be a reasonable return times the purchase price of the equipment. According to his computation the deductions claimed by petitioner were unreasonably low for the first three years and excessive for the fourth year as shown below: Taxable Year Ended
10/31/73
10/31/74
10/31/75
10/31/76
Deductions
$218,142 $279,090
$412,212
$683,889
Fair Rental
289,112 350,808
456,124
399,978
Excess
(70,970)
(71,718)
(43,912)
283,911
In view of the foregoing and from the record as a whole it is apparent that the equipment rentals paid by petitioner for fiscal years 1973, 1974 and 1975 are not excessive even in the opinion of respondent's own expert. With respect to fiscal year 1976 respondent's expert is of the opinion that the equipment rentals are excessive. However, Mr. Camras, petitioner's expert, is of the opinion that when considered *203 together both the hospital rents and the equipment rents for all years including 1976 are fair and reasonable when compared with other comparable hospitals and their equipment. For the reasons set forth hereinbefore we are convinced that Mr. Camras is more knowledgeable about the hospital industry in Orange County than either of respondent's witnesses and from his report and testimony we find that the equipment rentals paid by petitioner in 1976 are not excessive. Consequently, the equipment rentals claimed by petitioner for each of the fiscal years 1973 through 1976 are deductible. Decision will be entered under Rule 155.
Footnotes
1. In other words, petitioner agreed to pay as rent 13 percent of its gross billings, with a minimum annual rental of $720,000, or $3,364 per bed.↩
2. Consolidated Apparel Co. v. Commissioner,17 T.C. 1570 (1952), was reversed on this point (207 F. 2d 580 (7th Cir. 1953)), but on a finding by the Court of Appeals, that the taxpayer corporation involved therein had received adequate consideration for accepting the new lease. 207 F. 2d at 583↩.
3. Camras noted that fair market value also can be based on replacement cost, but that such an approach is not an adequate measure of the value of a going business because it does not consider intangible values such as goodwill and going concern value.↩
4. This fair market value included the cost of the hospital structure and the equipment therein. ↩
5. It is unclear why Camras applied an 11 percent rate of return for the six months preceding the addition and a 12 percent rate of return for the remaining six months. However using the same interest rate for the entire year would not have changed his conclusions.↩
6. Respondent argued on brief that petitioner owned some of the equipment it purportedly leased and that petitioner paid more in rent than the leases actually required.↩